```
            IN THE UNITED STATES DISTRICTS COURT
               FOR THE DISTRICT OF MONTANA
                    BILLINGS DIVISION


DEIDRE AGAN,             )Cause 1:19-cv-00083-SPW-TJC
                         )
        Plaintiff,       )
                         )    VIDEO DEPOSITION
    vs.                  )
                         )
BNSF RAILWAY CO., a      )         OF
Delaware corporation,    )
                         )
        Defendant.       )     DEIDRE AGAN
```

2722 Third Avenue North, Suite 400
Billings, Montana
May 27, 2020

APPEARANCES:

    Nelson G. Wolff (Phone)
    SCHLICHTER, BOGARD & DENTON LAW FIRM
    100 South Fourth Street, Suite 1200
    St. Louis, Missouri 63102
    nwolff@uselaws.com
        -and
    Russell D. Yerger
    YERGER LAW FIRM, P.C.
    2722 Third Avenue North, Suite 400
    Billings, Montana 59101
    ryerger@integra.net
        For the Plaintiff

    Anthony M. Nicastro
    KNIGHT NICASTRO MACKAY, LLC
    27 Shiloh Road, Suite 10
    Billings, Montana 59106
    nicastro@knightnicastro.com

        For the Defendant.

    Also present: Joel Hageman
             Videographer

**EXHIBIT 10**

## INDEX

| | Page |
|---|---|
| Examination by Mr. Nicastro | 6 |
| Examination by Mr. Wolff | 172 |
| Further Examination by Mr. Nicastro | 173 |

## EXHIBITS

| Number | Description | Page |
|---|---|---|
| 1 | BNSF Crew Management-Tape History | 60 |
| 2 | BNSF Return to Work Med. Questionnaire | 85 |
| 3 | 7/23/19 Dr. Ackerman visit | 90 |
| 4 | 12/16/08 Miles City Progress Note | 96 |
| 5 | 1/30/09 Miles City Progress | 98 |
| 6 | 2/10/09 Holy Rosary Screening Form | 102 |
| 7 | 3/4/09 Miles City Progress Note | 106 |
| 8 | 9/9/19 BNSF Medical Questionnaire | 111 |
| 9 | 10/2/12 Holy Rosary Radiology Report | 11 |
| 10 | 12/1/13 PA Kara Erickson visit, etc. | 128 |
| 11 | 8/8/14 Holy Rosary Healthcare visits | 139 |
| 12 | 12/23/14 Holy Rosary HC visit | 141 |
| 13 | Holy Rosary Healthcare records | 143 |
| 14 | On-train documents... | 149 |
| 15 | 8/24/16 Douglas Dalton PA record | 169 |
| 16 | 11/15/2016 Dr. Roccisano record | 170 |

1  The video deposition of DEIDRE AGAN,
2  produced, sworn and examined upon her oath on the
3  27th day of May, 2020, commencing at 9:03 a.m., at
4  2722 Third Avenue North, Suite 400, Billings,
5  Montana, before me, Frances L. Mock, a free-lance
6  reporter, a Notary Public within and for the State of
7  Montana pursuant to Notice and the Federal Rules of
8  Civil Procedure, for the examination of the said
9  DEIDRE AGAN, the plaintiff called for examination by
10 the defendant herein, in a certain suit and matter in
11 controversy now pending and undetermined in the said
12 United States District Court, District of Montana,
13 Billings Division, being Civil Action No.
14 1:19-cv-0083-SPW-TJC.

22 "mm-hmm" is yes
23 "huh-uh" is no

1    MR. HAGEMAN:  Good morning.
2    We are going on the record at 9:03 a.m. on
3  May 27th, 2020.
4    Please note that the microphones are
5  sensitive and may pick up whispering and private
6  conversations and cellular interference.
7    Please turn off all cell phones or place
8  them away from the microphones as they can interfere
9  with the deposition audio.
10   Audio and video recording will continue to
11 take place until all parties agree to go off the
12 record.
13   This is Media Unit 1 of the video recorded
14 deposition of Deidre Agan taken by counsel for the
15 defense in the matter of Deidre Agan, plaintiff
16 versus BNSF Railway Company, defendant filed in the
17 United States District Court for the District of
18 Montana, Billings Division.
19   This deposition is being held at the Yerger
20 Law Firm located at 2722 Third Avenue North,
21 Billings, Montana.
22   My name is Joel Hageman from the firm
23 Veritext, and I am the videographer.  The court
24 reporter is Fran Mock from the firm Veritext.
25   I'm not related to any party in this

1 Scott Weber case, did you ever receive a copy of that
2 deposition?
3    A.  No.
4    Q.  Okay.
5        Was there anything that we discussed during
6 that deposition or any sort of question that I had
7 for you at that deposition, an answer that you gave
8 at that deposition that you left the deposition and
9 said, wait a minute, I wished I answered it
10 differently, or I must have misunderstood something
11 from that deposition?
12    A.  No.
13    Q.  Okay.
14        What medical issues are you claiming in
15 this lawsuit that were related to the tree incident
16 back in August of 2016?
17    A.  I experienced headaches, neck pain, spinal
18 pain, left and right shoulder pain.  Numbness in my
19 fingers and in my right leg.  Lower back pain.  Mm,
20 nightmares, anxiety.
21        I think that's it.
22    Q.  Okay.
23        And I know you went into some physical, but
24 then anxiety has sort of some mental health issues.
25        Is there anything on the mental health

1 issues that you are claiming 1s related to this
2 accident other than anxiety and what I'll call the
3 nightmares?
4        I just want to make sure you understood
5 that I was asking that question very broadly.
6    A.  I don't really understand what you're
7 asking.
8    Q.  Sure.
9        Are you claiming any sort of depression
10 because of this?
11    A.  No.
12    Q.  Okay.
13        So, giving that as an example, are there
14 any other sort of mental health issues that you are
15 claiming as part of this lawsuit?
16    A.  No.
17    Q.  Okay.
18        Now, were the list of medical issues that
19 you gave me, were those all issues that you had right
20 after the accident?
21    A.  Well, I mean, immediately following the
22 accident, I had so much adrenaline going through me
23 from the fear of what had happened, that I went home
24 that night, and when I woke up the next morning,
25 that's when I started experiencing the pain and a lot

1 of the other, you know, the anxiety and whatnot.
2    Q.  Did you experience all of those issues
3 within, say, the first three days after the accident,
4 or were there some of them that started more than a
5 week after the accident?
6    A.  I don't recall the exact timeline.
7    Q.  Okay.
8        Headaches, when did the headaches start
9 after the accident?
10    A.  I couldn't -- I can't tell you a date.  I
11 -- yeah, I don't recall exactly.
12    Q.  Do you still have headaches?
13    A.  At times, yes.
14    Q.  How often do you have headaches?
15    A.  Mm, some days are good days.  Other days
16 aren't.  Sometimes it's -- there could be weeks where
17 it's every day.  There could be weeks where it's not.
18    Q.  What medical doctor, if any, has told you
19 that the headaches were related to the accident?
20    A.  The doctor doesn't have to tell me.  I
21 mean, I'm the one that feels it, so...
22    Q.  Has any doctor told you that the headaches
23 that you are feeling now in 2020 were caused by the
24 accident?
25    A.  I have not been to the doctor in 2020 for

1 headaches.
2    Q.  Has any doctor told you that the headaches
3 that you are experiencing currently were caused by
4 this accident?
5    A.  I have not seen the doctor recently.
6    Q.  When was the last time that you saw a
7 doctor for headaches?
8    A.  I don't recall.
9    Q.  Are you taking any medication for the
10 headaches?
11    A.  Ibuprofen.
12    Q.  Is that the over the counter, not the
13 prescribed amount?
14    A.  No.
15    Q.  Over the counter?
16    A.  Yes.
17    Q.  Okay.
18        So, roughly how often in a given month
19 would you say you have to take Ibuprofen because of
20 headaches?
21    A.  Daily.
22    Q.  Okay.
23        Is there a particular reason why you
24 haven't gone to see a doctor to have the doctor treat
25 you for the headaches and asked the doctor if it's

Page 14

1 related to this accident?
2    A.  Recently, with the Covid-19 thing, it is
3 hard to get in to the doctor.
4        Prior to that, I was trying to get back on
5 my feet and work and maintain my employment.
6    Q.  Well, in 2019, were you working full time?
7    A.  Yes.
8    Q.  Okay.
9        Was there something that was happening that
10 was causing you to not be able to work full time for
11 BNSF?
12    A.  No.
13    Q.  The reason I ask that question is because
14 you mentioned you were trying to keep your
15 employment.
16        When I heard that, I was thinking that
17 there was some sort of roadblock or something that
18 was causing you to not be able to keep that job,
19 whether it be a family situation, a personal
20 situation or a medical situation.
21    A.  No. Just trying to stay within the
22 availability guidelines.
23    Q.  Okay.
24        And we said -- but within staying within
25 the availability guidelines --

Page 15

1    A.  Mm-hmm.
2    Q.  -- you're able to lay off sick from time to
3 time, correct?
4    A.  That is correct.
5    Q.  How often are you able to lay off -- lay
6 off personal?
7    A.  Well, I have to be available 75% of the
8 time, so...
9    Q.  Sure.
10       If you needed to see a doctor because of a
11 medical issue in 2019, did you have the availability
12 to lay off from your job to see a doctor?
13    A.  Yes.
14    Q.  So, in 2019, is there any particular reason
15 why you didn't see a doctor for headaches?
16    A.  No.
17    Q.  So, is it fair to say that currently, there
18 are no doctors that are treating you for the headache
19 symptoms that you're claiming as part of this
20 lawsuit?
21    A.  Yes.
22    Q.  Did you ever have headaches -- let me ask
23 you this:
24       What do you think is -- what do you think
25 is causing your headaches, you personally?

Page 16

1    A.  Mm, personally I think it's from the
2 injuries to my neck.
3    Q.  Okay.
4       So, you think your headaches are coming
5 from your neck, your cervix -- cervical spine, maybe?
6    A.  Yeah, somewhere back there.
7    Q.  And have you ever had headaches that were
8 coming from your cervical spine before?
9    A.  Not that I can recall.
10    Q.  Now, you mentioned neck pain -- neck and
11 spine pain.
12       Where specifically are you having the pain
13 that you're claiming as part of this lawsuit --
14       Let me ask you this, I'm sorry. Strike
15 that.
16       Do you currently have neck pain?
17    A.  At this moment?
18    Q.  Well, yeah, as you sit here today?
19    A.  Not at this moment, no.
20    Q.  What about in the last week, have you had
21 neck pain?
22    A.  Yes.
23    Q.  Do you think it's coming from your cervical
24 spine?
25    A.  I don't know.

Page 17

1    Q.  How often do you have neck pain?
2    A.  Once again, sometimes it's daily, and then
3 there's other days where it doesn't hurt.
4    Q.  Where in your neck does it hurt when you
5 have the pain? Can you kind of point to it just so I
6 know what part of your neck?
7    A.  It's like my -- it's all down my spine and
8 in through my shoulders.
9    Q.  Okay.
10       And do you have the shoulder pain at the
11 same time that you have the neck pain, or do you
12 sometimes have just neck pain; no shoulder pain?
13    A.  Mm, sometimes there's only shoulder pain.
14 Other times there's only neck pain.
15    Q.  Is there one shoulder that hurts more than
16 the other?
17    A.  I can tell you right now, my right shoulder
18 hurts more than my left does at this moment.
19    Q.  Is that typical? If you would look back at
20 the last month, does one shoulder hurt more than the
21 other?
22    A.  At times. I mean, yeah.
23       I mean -- like I said, at this moment, my
24 right shoulder hurts more than my left does.
25       I -- I work through it, and I safely

| Page 18 | Page 20 |
|---|---|
| 1 perform my job, but there is still pain. | 1    Q. Okay. |
| 2    Q. Do you typically have one shoulder that | 2       So, if you went to Ortho Montana right now, |
| 3 hurts more than the other? | 3 are you saying they're not seeing you? They refuse |
| 4    A. Sometimes. | 4 to see you? |
| 5    Q. I'm just saying in general, like if you | 5    A. I don't know. |
| 6 were to add up all the days in the last six months, | 6    Q. Okay. |
| 7 does your right shoulder hurt shoulder hurt more than | 7       So, do you even know how much it would cost |
| 8 your left? Left more than the other, or are they | 8 if you went to Ortho Montana with your current health |
| 9 equal? | 9 insurance to have one of the doctors who previously |
| 10   A. Probably equal. | 10 treated you follow up with you? |
| 11   Q. Which medical provider are you seeing for | 11   A. No. |
| 12 neck and shoulder pain currently? | 12   Q. So, the only reason you didn't go back to |
| 13   A. I have not seen a medical provider | 13 the doctor in 20 -- so, the only reason you haven't |
| 14 recently. | 14 gone back to Ortho Montana is because of some unpaid |
| 15   Q. In 2019, did you see a medical provider for | 15 bills from 2016? |
| 16 neck and shoulder pain? | 16   A. No health insurance. |
| 17   A. No. | 17   Q. When did you get health insurance back, |
| 18      I saw one to establish care. | 18 though? |
| 19   Q. And when was that? | 19   A. In 2019. |
| 20   A. I couldn't tell you exactly when. | 20   Q. When were you reinstated for work? |
| 21   Q. Are we talking in 2019? | 21   A. 2019. |
| 22   A. Yes, I believe. | 22   Q. Okay. |
| 23   Q. Okay. | 23      And what month? |
| 24      Has any doctor in the last year and a half | 24   A. February. |
| 25 told you that the shoulder and neck symptoms that | 25   Q. So at the beginning of the year, correct? |

| Page 19 | Page 21 |
|---|---|
| 1 you're feeling right now are related to the accident? | 1    A. Correct. |
| 2      MR. WOLFF: Object to the lack of | 2    Q. Correct. |
| 3 foundation. | 3       And so you would agree that from February |
| 4      Subject to that, you may answer. | 4 of 2019 up until the present day, you've had health |
| 5      THE WITNESS: Repeat the question. | 5 insurance, so your doctor visit with either one of |
| 6 BY MR. NICASTRO: | 6 those doctors at Ortho Montana probably would have |
| 7    Q. Sure. | 7 been covered? |
| 8      Has any medical provider in the last year | 8      MR. WOLFF: Object to the form. It calls |
| 9 and a half told you that the neck and shoulder issues | 9 for speculation. |
| 10 that we just discussed were caused the accident? | 10 BY MR. NICASTRO: |
| 11   A. No. | 11   Q. Go ahead and answer. |
| 12   Q. And if the answer's the same, that's fine. | 12   A. You said it would probably be covered? |
| 13 I want to be sure I'm clear on it. | 13   Q. Let me ask you it this way: |
| 14      In 2019, what was the reason for not seeing | 14      Can you think of any -- can you give me any |
| 15 a doctor for a neck or shoulder pain? Is it the same | 15 particular reason why you think they may not have |
| 16 reason that you gave for not seeing a doctor for the | 16 been covered by your health insurance? |
| 17 headaches? | 17      MR. YERGER: Calls for a legal conclusion. |
| 18   A. Yes. | 18      Go ahead and answer it. |
| 19   Q. Why have you not gone back to Ortho Montana | 19      THE WITNESS: No. |
| 20 to have them look at these symptoms? | 20 BY MR. NICASTRO: |
| 21   A. Because my medical bills were never paid by | 21   Q. Have you tried to go see any doctor for any |
| 22 the company. | 22 of these medical conditions, and a doctor either |
| 23   Q. So if you went to Ortho Montana last -- do | 23 didn't see you because of unpaid medical bills, or |
| 24 you have insurance currently? | 24 told you that they wouldn't see you unless you paid |
| 25   A. Yes. | 25 an amount of money that you thought was unreasonable? |

| Page 26 | Page 28 |
|---|---|
| 1  A. Not specifically. | 1  Q. Meaning once a month, or -- |
| 2     I mean, when I saw Dr. Roccisano, it was | 2  A. Sometime once a month. Sometimes twice a |
| 3 for my neck and my spine and my back. | 3 week. |
| 4  Q. And what do you recall him saying? | 4  Q. And have you seen any sort of medical |
| 5  A. He -- about what? | 5 provider for treatment for that? |
| 6  Q. About your neck, your back and your spine? | 6  A. No. |
| 7  A. He suggested that I get an MRI. | 7  Q. And what are the nightmares? |
| 8  Q. Did you have the MRI? | 8  A. That I'm being impaled by a tree? |
| 9  A. No. | 9  Q. Anything else, or is it just that one |
| 10  Q. And why not? | 10 nightmare over and over? |
| 11  A. Because I had shoulder surgery shortly | 11  A. Same nightmare over and over. |
| 12 after. | 12  Q. Have you discussed those nightmares with |
| 13     And after I had right shoulder surgery, I | 13 any doctor? |
| 14 developed deep vein thrombosis in my left arm, and I | 14  A. No. |
| 15 couldn't do that. | 15  Q. Are you -- are you seeing a mental health |
| 16     I couldn't have an MRI while I was on blood | 16 physician? |
| 17 thinners, and I was on those for six months. | 17  A. No. |
| 18  Q. Did you have an MRI once you were done with | 18  Q. How about anxiety? Tell me what -- |
| 19 the blood thinners? | 19 describe the anxiety that you are claiming in this |
| 20  A. No. | 20 lawsuit. |
| 21  Q. And why not? | 21  A. It's the fear that there's times that I |
| 22  A. Didn't have health insurance. | 22 will go to work, and I won't go home to my kids. |
| 23  Q. You've had health insurance in the last | 23  Q. And how often do you feel that anxiety? |
| 24 year and a half. Have you had that MRI that | 24  A. Every time I get on a train. |
| 25 Dr. Roccisano recommended? | 25  Q. When did this anxiety start? |

| Page 27 | Page 29 |
|---|---|
| 1  A. No. | 1  A. Right after I went back to work in 2019. |
| 2  Q. Why not? | 2  Q. And are you seeing any sort of mental |
| 3  A. The same reasons that I stated earlier. | 3 health provider for the anxiety? |
| 4  Q. And so going back to what, if anything, did | 4  A. I'm not seeing a mental health provider. |
| 5 Dr. Roccisano say about what was causing your low | 5  Q. Has any doctor told you that the anxiety |
| 6 back pain? Even though I know you didn't do the MRI, | 6 was caused by the accident? |
| 7 but what, if anything, did he say about what he | 7  A. No. |
| 8 thought might have been causing it, if anything? | 8  Q. Have you ever had anxiety prior to the |
| 9  A. He didn't say. He just suggested that I | 9 accident? |
| 10 get an MRI. | 10  A. Yes. |
| 11  Q. So, fair to say that Dr. Roccisano did not | 11  Q. How often? |
| 12 say it was caused by the accident? | 12  A. A couple times. |
| 13  A. (No response.) | 13  Q. Anxiety about what? What was it related |
| 14  Q. Let me rephrase the question. | 14 to? |
| 15     Is it fair to say that no doctor has said | 15  A. I don't know. |
| 16 that your low back pain was caused by the accident? | 16  Q. What sort of situations would create -- |
| 17  A. Yes. | 17 would cause the anxiety for you? Make you be |
| 18  Q. Okay. | 18 anxious, I guess? |
| 19     So the nightmares, was this -- when did the | 19  A. It wasn't a specific situation. |
| 20 nightmares start? | 20  Q. Okay. |
| 21  A. Within days after the collision. | 21     So, give me an example of some of the |
| 22  Q. And you still have them? | 22 anxiety that you had prior to the accident? |
| 23  A. From time to time. | 23  A. Mm, just nervousness for no apparent |
| 24  Q. How often? | 24 reason. |
| 25  A. Monthly. | 25  Q. Okay. |

Page 30

1  Were you ever seeing a medical provider for
2  your anxiety?
3     A.  I did see one.
4     Q.  Were you ever taking medication for your
5  anxiety?
6     A.  I did.
7     Q.  And what medication was that?
8     A.  I don't recall.
9     Q.  Have you taken any medication for the
10 anxiety that you're claiming in this lawsuit?
11    A.  No.
12    Q.  Why not?
13    A.  Because I preferred not to take
14 psychotropic drugs or things that -- anxiety
15 medication is extremely dangerous to be on on the
16 railroad.
17    Q.  Okay.
18       So you're not taking anxiety medication
19 because of your job?
20    A.  Well, because I don't -- because I don't
21 like the effects of feeling slowed down and --
22 anxiety makes you extremely sleepy.  It -- just the
23 side effects are not -- I don't like the side
24 effects.
25    Q.  When did you start working for BNSF?

Page 31

1     A.  2011.
2     Q.  And from 2011 to the present date have you
3  ever taken medication for anxiety?
4     A.  I don't recall.
5     Q.  Do you recall whether or not you ever
6  took -- you were ever prescribed anxiety medication
7  while you were working for BNSF?
8     A.  I don't recall.
9     Q.  Who would be the medical provider who would
10 have prescribed the anxiety medication while you were
11 working for BNSF?
12    A.  I don't recall.
13    Q.  Who would be the medical provider who would
14 have prescribed the anxiety medication?
15    A.  I'm not exactly sure who it would have
16 been.
17    Q.  Have you ever missed any work because of
18 any of these issues?
19    A.  Any of --
20    Q.  Any of these medical issues we've just been
21 discussing?  Have you ever missed a day of work of
22 work because of those medical issues?
23    A.  I have taken sick days, yes.
24    Q.  When you have taken -- how many sick days
25 have you taken because of this issue?

Page 32

1     A.  I couldn't give you an exact number.
2     Q.  Have you laid off sick because of reasons
3  other than these issues?
4     A.  Yes.
5     Q.  What other reasons have you laid off sick?
6        Well, let me back up.
7        When I use the term "lay off sick" and "lay
8  off personal", are they the same thing, or are they
9  different when you're working your schedule on the
10 railroad?
11       Describe that to me.  Is there a
12 difference?
13    A.  Well, sick is sick, and personal is
14 personal.
15    Q.  When you lay off sick, do you have to
16 provide a doctor's note?
17    A.  No.
18    Q.  When you lay off personal, do you have to
19 provide a particular reason?
20    A.  No.
21    Q.  So, can you lay off sick even though you're
22 not sick at BNSF?
23    A.  I sure it's possible.
24    Q.  Okay.
25       Have you ever done that?

Page 33

1     A.  Yes.
2     Q.  All right.
3        So, if you just for whatever reason wanted
4  a day off from work; you were going to spend some
5  time with some friends; the weather's nice, you can
6  lay off sick, but you're not actually sick, right?
7     A.  It is possible to do that, yes.
8     Q.  Okay.
9        And have you done that before?
10    A.  Once.
11    Q.  Once, okay.
12       Have you ever laid off sick more than once
13 for reasons other than being sick?
14    A.  No.
15    Q.  Okay.
16       Laying off personal, under what
17 circumstances would you lay off personal?
18    A.  Personal reasons.
19    Q.  Okay.
20       And do you have to give a particular reason
21 for that?
22    A.  No.
23    Q.  And when you lay off sick and lay off
24 personal, does the computer give you an option of
25 putting in the reason why?

Page 42

1  we just discussed?
2  A. No.
3  Q. So, if you did lay off sick for any of
4  these particular reasons, and you were working on the
5  pool, why would you lay off sick? Just to protect
6  not getting called for a train, is that how it works?
7  A. I don't understand your question.
8  Q. I guess I'm getting at is when you -- you
9  said you laid off sick because of some of these
10 reasons that we talked about, some of these medical
11 reasons since you returned back to work in 2019,
12 correct?
13 A. Yes, correct.
14 Q. And would that have been so you wouldn't
15 get called for a particular train, or just because
16 you were having the symptoms, and you wanted to lay
17 off sick?
18 A. Because of the symptoms.
19    A train is a train.
20 Q. Okay.
21    Have you ever told any of your supervisors
22 that you were still having these symptoms?
23 A. No.
24 Q. Have you told anybody with the BNSF Medical
25 Department that you're having these symptoms?

Page 43

1  A. No.
2  Q. Have you ever told any of your supervisors
3  that you missed a day of work because of these
4  symptoms?
5  A. No.
6  Q. Have you ever told anybody from the Medical
7  Department that you missed a day because of these
8  symptoms?
9  A. No.
10 Q. Do you work only as a conductor, or do you
11 work as like a switchman, brakeman as well?
12 A. I work either as a conductor or a brakeman.
13 Q. Conductor or brakeman, okay.
14 A. Mm-hmm.
15 Q. And you understand what the essential job
16 functions of that job is?
17 A. Yes.
18 Q. Do you feel that in the last year and a
19 half, you've been able to do all of those functions
20 safely?
21 A. Yes.
22 Q. Do you operate switches as a switchman/
23 brakeman?
24 A. Yes.
25 Q. Have you had any difficulty performing that

Page 44

1  job task because of the issues that you're claiming
2  in this lawsuit?
3  A. Yes.
4  Q. Have you told any of your supervisors about
5  that?
6  A. No.
7  Q. Why not?
8  A. Because if the switch is hard to throw, you
9  bad order it.
10 Q. Have you ever bad ordered a switch for
11 being hard to throw?
12 A. Yes.
13 Q. But have you ever told any of your
14 supervisors that you're having difficulty operating
15 switches because of some of these medical issues?
16 A. No.
17 Q. And why not?
18 A. Because go to work, and you keep your mouth
19 shut.
20 Q. Who is your supervisor?
21 A. The Forsyth trainmaster is John Klemm.
22 Q. Okay.
23    Has John Klemm ever told you that
24 conductors and switchmen should go to work and keep
25 their mouth shut and not talk to them about any

Page 45

1  difficulties, medical difficulties they might be
2  having at work?
3  A. No.
4  Q. Has anybody in the Medical Department told
5  you that that's the way that you should be working at
6  BNSF?
7  A. No.
8  Q. So, why is it that you do that?
9  A. Because in my experience, it -- things go a
10 lot smoother if you just go to work and go home
11 and -- leave it at that.
12 Q. Okay.
13    So it's a personal reason for you?
14 A. Yes.
15 Q. Is it based on any specific examples that
16 you can give me today?
17 A. No.
18 Q. Can you give me any particular reason as to
19 why you would think the Medical Department would not
20 want to know that your job tasks are causing you some
21 medical problems?
22    MR. YERGER: Speculation. Argumentative.
23    Go ahead and answer.
24    THE WITNESS: Repeat the question.
25 //

BY MR. NICASTRO:
Q. Sure.
  Can you give me any reason why you think that the Medical Department wouldn't want to know that you're out there working but having medical problems while performing the essential functions of your job?
A. No.
Q. Same question, but I'll just put your supervisors as opposed to the Medical Department. Can you think of any particular reason why your trainmasters would not want to know about any medical issues you're having while performing the essential functions of your job?
  MR. YERGER: Same objections. Go ahead.
  THE WITNESS: No.
BY MR. NICASTRO:
Q. Has anyone at BNSF, supervisor or coworker or Medical Department, ever told you that there would be some sort of negative repercussions if you did tell them that you were having medical problems while performing the essential functions of your job?
A. No.
Q. Have you asked BNSF for any accommodations in your work -- in your job?

A. No.
Q. Have any doctors recommended that you ask for any sort of accommodations in your work?
A. I -- time frame?
Q. The last year and a half since you've come back to work.
A. No.
Q. Have you been given any sort of medical restrictions or recommendations with respect to your work tasks from any medical professional?
A. Time frame?
Q. Since coming back to work?
A. No.
Q. Have you inquired, sought restrictions from doctors, asked any doctors about any restrictions that they would recommend?
A. No.
Q. Has any doctor recommended in the last year and a half or told you that you're going to have any sort of future medical treatment?
A. No.
Q. Has any doctor since the accident besides, obviously, the surgery you had on your shoulder --
A. Mm-hmm.
Q. -- told you that you would more likely than

not have future surgery?
A. Yes.
Q. And who told you that, and when?
A. Dr. Shenton.
Q. Okay.
  What did he say?
A. That I should have my left shoulder done as well.
Q. Okay.
  When you say "left shoulder done", what was he recommending?
A. (No response.)
Q. Like a scope surgery? What was he recommending? What was wrong your left shoulder?
A. Well, the pain.
Q. Okay.
  What surgery was he recommending?
A. I'm not exactly sure what the surgery would entail.
Q. Did he ever tell you what was causing the problems with your left shoulder?
A. Mm, no.
Q. Did he ever say that the issues that you were having in your right shoulder and that need for surgery was caused by the accident?

A. Yes.
Q. Did you have problems with your left shoulder prior to the accident?
A. I have, but not for approximately three or four years prior.
Q. Has any doctor told you that you will need surgery on your neck?
A. No.
Q. Has any doctor told you that you would need surgery on your low back?
A. No.
Q. Has any doctor told you that you might need surgery on your right shoulder again?
A. No.
Q. So, when was the last time that Dr. Shenton said that you might need surgery on your left shoulder? What year would this have been?
A. 2016.
Q. Did he give you a timeline? Next six months? Next year? Next decade?
A. Well, there again, I was on blood thinners for six months, so I couldn't even get an MRI, or definitely couldn't get cut open.
Q. When you discussed surgery with Dr. Shenton, did he give you any indication as to

Page 158

1  Q. Right.
2     But even if the tree is just standing
3  straight up and down, have you noticed a tree
4  standing straight up and down or next to the track
5  that if they fell, they would land on the track in
6  the Forsyth Subdivision?
7  A. Yes.
8  Q. Have you noticed more than one of those
9  trees that fit that definition?
10 A. Yes.
11 Q. Have you noticed roughly what's -- beside
12 this one that we know your train hit, besides that
13 one, what would you estimate being the height of some
14 of those trees; the tallest other tree that you've
15 seen on the Forsyth Subdivision next to a track?
16 A. Approximately the same height as the one
17 that we hit.
18 Q. Have you seen trees with the similar
19 diameter of, you know, in diameter than the tree that
20 you hit along the Forsyth Subdivision next to the
21 railroad tracks?
22 A. Yes.
23 Q. Have you ever reported those to a
24 supervisor, Safety Hotline or written a SIRP about
25 any of those particular SIRPS?

Page 159

1  A. No.
2  Q. Is this the only tree that you've seen on
3  the Forsyth Subdivision that was leaning towards the
4  tracks?
5  A. Ever?
6  Q. Yeah.
7  A. No.
8  Q. Have you seen other trees leaning towards
9  the track on the Forsyth Subdivision that if they
10 fell over, they would land on the tracks?
11 A. I had.
12 Q. Had you ever reported any of those trees?
13 A. They were discussed in Safety Marathons.
14 Q. And what was the result? Where were those
15 trees, and --
16 A. There was one by Bowman that's no longer
17 there.
18    I can't recall where the other one -- where
19 another one might have been.
20 Q. Okay.
21    Did you ever see some of those trees that
22 were leaning toward the track still -- stay next to
23 the track even though they were addressed during a
24 Safety Marathon?
25 A. Yes.

Page 160

1  Q. And again, Safety Marathons, I think we
2  talked about this in the deposition, but the Safety
3  Marathons are just the conversations that occur
4  between the conductors, engineers and the Safety
5  Coordinator, who is also an engineer or a conductor,
6  but not a supervisor, right?
7  A. Yes.
8  Q. Okay.
9  A. And they report back to the supervisor.
10 Q. Yeah.
11    And it's on them to report back to the
12 supervisor?
13 A. Yes.
14 Q. And if they don't report back to the
15 supervisor, then the supervisor doesn't hear what
16 happens during the Safety Marathons, fair?
17 A. Yes.
18    MR. WOLFF: Objection. Compound. Lack of
19 foundation and calls for speculation.
20    Deidre, I'm going to ask that you pause in
21 between his questions and your answers so either Russ
22 or I can have an opportunity to make an objection.
23    THE WITNESS: Okay.
24 BY MR. NICASTRO:
25 Q. During Mr. Weber's case, there were some

Page 161

1  documents that came up from a 2006 and a 2008 SIRP
2  about trees. I know you weren't working for the
3  company at the time, but were you aware of those
4  SIRPs, I'll just say at the time I took your
5  deposition?
6  A. No.
7     MR. WOLFF: Objection. Lack of foundation.
8  It's compound. It calls for speculation.
9  BY MR. NICASTRO:
10 Q. As you sit here today, did you know that
11 there was a 2006 and a 2008 SIRP that mentions trees
12 around, say within ten miles of that mile marker
13 where this tree was at?
14    MR. WOLFF: Object to the vague form and
15 lack of foundation.
16    THE WITNESS: Say the question one more
17 time.
18 BY MR. NICASTRO:
19 Q. Sure.
20    Were you -- are you aware of any older
21 SIRPs that predate your employment that had to do
22 with trees around Milepost 175 through 180, we'll
23 say?
24 A. I have not ever pulled the SIRP -- I don't
25 even know to pull up a SIRP report.

Page 174

1  accumulate vacation days that you could use in 2018?
2      A.  Yes.
3      Q.  So in 2019, did you also not accumulate --
4  not have vacation days because you were not working
5  because of the termination?
6      A.  Yes.
7          MR. NICASTRO:  All right.
8          Nothing further.
9          MR. WOLFF:  She will waive.
10         MR. HAGEMAN:  All right.
11         We're off the record at 2:00 p.m., and this
12 concludes today's testimony given by Deidre Agan.
13 The number of total Media Units was 4 and will be
14 retained by Veritext.
15         (Whereupon, signature waived.)
16         (Whereupon, the deposition was concluded at
17 2:00 p.m.)
18
19
20
21
22
23
24
25

Page 175

1           CERTIFICATE
2
3    STATE OF MONTANA   )
                        ) ss.
4    County of Yellowstone.)
5
         I, Frances L. Mock, a free-lance shorthand
6  reporter, a Notary Public in and for the State of
   Montana, do hereby certify that previous to the
7  commencement of the examination of the said DEIDRE
   AGAN, a witness called for examination by the
8  defendant in the said suit in the said U.S. District
   Court, District of Montana, Billings Division, being
9  Civil Action No. 1:19-cv-000830-SPW-TJC, she was duly
   sworn by me to testify the truth in relation to the
10 matters in controversy now pending and undetermined
   between the said parties so far as she should be
11 interrogated concerning the same;
12      That this deposition was taken in shorthand
   by me at 2722 Third Avenue North, Suite 400,
13 Billings, Montana, on the 27th day of May, 2020,
   commencing at 9:03 a.m., and was reduced to
14 typewritten form by me;
15      That the foregoing is a true transcript of
   the questions asked, the testimony given and the
16 proceedings had;
17      That I am neither attorney nor counsel, nor
   in any way connected with any attorney or counsel for
18 any of the parties to said action or otherwise
   interested in its event.
19
         IN WITNESS I have hereunto set my hand and
20 affixed my notarial seal this 7th day of June, 2020.
21      My commission expires December 19, 2023.
22
23
24         <%6686,Signature%>
25