IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| DEIDRE AGAN,<br><br>               Plaintiff,<br><br>vs.<br><br>BNSF RAILWAY COMPANY,<br><br>               Defendant. | CV 19-83-BLG-SPW-TJC<br><br><br>**FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |

Plaintiff Deidre Agan ("Agan") brings this action against Defendant BNSF Railway Company ("BNSF") under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 ("FELA"), alleging negligent acts or omissions resulting in injuries she sustained while operating a locomotive as a conductor. (Doc. 1.)

Before the Court are BNSF's motions for summary judgment. (Docs. 41, 49.) The first motion pertains to Agan's negligence claims and the second motion relates to the issue of damages. The motions have been referred to the undersigned under 28 U.S.C. § 636(b)(1)(B), are fully briefed, and ripe for review. For the following reasons, the Court recommends that the motion as to negligence be granted in part and denied in part, and the motion as to damages be denied.

1

## I.   Factual Background[1]

Agan started working for BNSF's transportation department in 2011.  On August 22, 2016, she held the position of conductor and was dispatched, along with engineer Scott Weber, to Laurel, Montana, where they picked up a train late in the afternoon to move it east to Forsyth, Montana.  At approximately 9:00 p.m., Weber and Agan's train rounded a curve traveling 53 miles per hour to find a large cottonwood tree laying across the tracks.

Weber and Agan had seconds to react.  Weber stayed at the controls, applied the brakes to avoid derailment, and told Agan to "duck."  Agan attempted to get out of her seat to get on the floor to avoid tree branches coming through the windshield.  The train hit the tree, which was calculated to be approximately three feet in diameter at the base and nearly six tons in weight.  The collision shattered the windshield of the locomotive, spreading glass through the interior, and bending the exterior snowplow and handrail.  Agan was thrown to the conductor's desk and then to the floor.

Agan sustained injuries to her neck and shoulders.  She underwent shoulder surgery in November 2016 and subsequently developed deep vein thrombosis in

---

[1] The background facts set forth here are relevant to the Court's determination of the pending motions for summary judgment, are taken from the parties' submissions, and are undisputed unless otherwise indicated.

her left arm.  Agan alleges she continues to experience pain in her neck and shoulders but has since returned to work for BNSF as a conductor.

The cottonwood tree involved in the incident was known to exist by BNSF. Prior to the incident in March 2016, a BNSF conductor, Don Purdon, reported the cottonwood tree as a safety risk to BNSF's safety hotline.  Pardon reported that the tree appears to be "burned out" and dead, was leaning, and was going to fall over the tracks at "any time."  (Doc. 56 at ¶¶ 68-69.)  He also noted that the tree was next to an irrigation ditch, and he voiced concern that this might make the base weak enough that it will come down.  (*Id.* at ¶ 70.)  BNSF disputes any characterizations or representations that Purdon made in his report as impermissible hearsay.  ((Doc. 62 at 14-15.)

It is undisputed, however, that after Purdon's report BNSF inspected and photographed the tree in April 2016.  The photographs show bark missing from the tree's base, the tree leaning toward the tracks, and an adjacent cottonwood laying dead nearby.  (*See* Doc. 56-5 at 2.)  BNSF division engineer Keith Samples reviewed the photographs and determined that while there was no immediate danger of the tree falling, it would be removed as soon as an excavator was available in the area.  Samples then visited the site to remove the tree in late June or early July with a host of BNSF employees and an excavator in tow.  At that

time, Samples determined that the tree was alive, and he did not think it was in danger of falling.  BNSF left the tree standing.

Agan filed suit against BNSF under the FELA on August 13, 2019, alleging various negligent acts or omissions relating to the collision with the tree.  Germane to the present motions for summary judgment, Agan alleged BNSF failed to provide reasonably safe conditions for work, including failing to maintain trackside vegetation and/or temporarily reducing the speed of trains at the location; failing to control vegetation along the tracks in violation of 49 C.F.R. § 213.37; failing to design the interior of the locomotive with seat belts and cushioning for safety; and failing to train and instruct crew members on minimizing the risk and magnitude of injury in the event of an imminent collision.  (Doc. 1.)

## II.    Legal Standard

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party.  *Id*.  "Disputes over irrelevant or

4

unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party fails to discharge this initial burden, summary judgment must be denied; the court need not consider the non-moving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

"Summary judgment is rarely granted in negligence cases because the issue of '[w]hether the defendant acted reasonably is ordinarily a question for the trier of fact.'" *Christensen v. Georgia-Pac. Corp.*, 279 F.3d 807, 813 (9th Cir. 2002) (quoting *Martinez v. Korea Shipping Corp., Ltd.*, 903 F.2d 606, 609 (9th Cir.1990).

## III.   Discussion

BNSF has filed two separate summary judgment motions.  (Docs. 41, 49.)
The first motion challenges Agan's negligence claim for failure to disclose an
expert witness who can establish the applicable standard of care.  (Doc. 42 at 6.)
In the alternative, BNSF also moves for partial summary judgment as to certain
specific allegations of negligence.  (*Id.* at 7.)  The second motion challenges
Agan's ability to establish future damages, including future pain and suffering, loss
of household services, and loss of earning capacity.  (Doc. 49.)

### A.   Motion for Summary Judgment – Negligence

The FELA "is founded on common-law concepts of negligence and injury,
subject to such qualifications as Congress has imported into those terms."  *Urie v.
Thompson*, 337 U.S. 163 (1949).  BNSF's principal argument is that Agan cannot
establish a negligence claim because she failed to disclose an expert who can
establish the applicable standard of care for maintenance of the tree in question.
(Doc. 42 at 9-10.)

In the alternative, BNSF argues that the regulation governing vegetation
along railways found in 49 C.F.R. § 212.37 is inapplicable; allegations relating to
seatbelts and cushioning in the locomotive are precluded by the Locomotive
Inspection Act; allegations relating to a failure to reduce train speed in light of a
known hazard are preempted by the Federal Railroad Safety Act; and, finally, the

6

allegations regarding the adequacy of instruction and training in the event of an imminent collision lack evidentiary support. (*Id.* at 18, 21, 24.)

Agan responds that she will not pursue allegations relating to seatbelts and cushioning in the locomotive, or inadequate instruction and training. (Doc. 55 at 8, FN1.) Partial summary judgment is, therefore, appropriate as to those claims. Agan's remaining responses will be addressed in tandem with BNSF's arguments.

### 1.   Standard of Care – Expert Testimony

BNSF asserts that the standard of care for assessing the integrity of the cottonwood and the risk of it falling is beyond the experience of an ordinary lay person, and therefore must be established by an expert. (Doc. 42 at 9-10.) BNSF argues that since Agan did not disclose a tree expert, her negligence claim fails. (*Id.*, 16.)

Agan argues that she need not introduce expert testimony to establish a standard of care. Agan contends that the standard of care under the FELA is ordinary care, and therefore she must only "show circumstances which a reasonable person would foresee as creating a potential for harm." (Doc. 55 at 11.)

In general, "expert testimony is required when the issue presented is sufficiently beyond the common experience of the trier of fact and the expert testimony will assist the trier of fact in determining the issue or understanding of the evidence." *Dubiel v. Montana Dep't of Transp.*, 272 P.3d 66, 70 (Mont. 2012)

7

(citing *Dayberry v. City of E. Helena*, 80 P.3d 1218, 1221 (Mont. 2003)).  A

common example of an issue beyond the experience of the trier of fact is a medical

standard of care.  See e.g., *Gilkey v. Schweitzer*, 983 P.2d 869, 871 (Mont. 1999)

(threshold obligation of plaintiff in medical malpractice case is to first establish

standard of care typically through expert testimony "because the conduct

complained of is usually not readily ascertainable by a layman.").  Expert

testimony is unnecessary, however, where the acts in question are within the

common knowledge or experience of lay persons.  *Nedeau v. Armstrong*, 2011 WL

849744, at *4 (E.D. Wash. Mar. 8, 2011) (professional negligence standard

inapplicable "outside context of investment advising, healthcare, law, engineering,

real estate, accounting, insurance and the like."); *Durbin v. Ross*, 916 P.2d 758,

763 (Mont. 1996) (expert testimony not necessary to establish a fraud claim where

the defendants were held to the same standard of care as an ordinary citizen).

Here, no specialized knowledge is required beyond the knowledge and

degree of care of any landowner who must determine whether a tree on their

property constitutes a hazard and needs to be removed.  See e.g., *City of Fitzgerald*

*v. Caruthers*, 774 S.E.2d 777, 780 (Ga. 2015) ("A landowner is charged with

knowledge of the dangerous condition of a tree if a layperson should have known

the tree was diseased.")  Thus, the standard of care is "what a reasonable and

prudent man would ordinarily have done under the circumstances of the situation."

*Tiller v. Atl. Coast Line R. Co.*, 318 U.S. 54, 67 (1943); *Wells v. San Joaquin Valley R.R.*, 2007 WL 2825715, at *3 (E.D. Cal. Sept. 26, 2007); *Dykes v. BNSF Ry. Co.*, 2019 WL 1128521, at *2 (W.D. Wash. Mar. 12, 2019).

In context of summary judgment, Agan has presented facts from which a reasonably prudent landowner could determine the tree at issue needed to be removed.  BNSF conductor, Don Purdon, notified the BNSF safety hotline in March 2016 of the tree's lean toward the tracks, its burned-out base, and its potential for falling at any time.  (Doc. 56. at ¶¶ 5-6; Doc. 62 at ¶ 43.)  BNSF contends that the information conveyed by Purdon is inadmissible hearsay and should not be considered on summary judgment.[2]  But even in the absence of his notification, Agan has established a genuine issue of material fact regarding BNSF's notice of the potential hazard.

---

[2] BNSF argues that information regarding Purden's reporting was derived from a Fed. R. Civ. P. 30(b)(6) deposition of Samples and others and is inadmissible hearsay since their testimony was not based on personal knowledge.  (Docs. 42 at 17; 61 at 4.)  BNSF's position is contradicted by several authorities.  See e.g., *Harris v. Vector Mktg. Corp.*, 656 F.Supp.2d 1128, 1132 (N.D. Cal. 2009) (citing 11–56 Moore's Fed. Prac.—Civ. § 56.14[1][c] "[t]he testimony of a Rule 30(b)(6) corporate agent deponent may be presented on motion for summary judgment, even though not based on personal knowledge, because a Rule 30(b)(6) witness need not have personal knowledge of the facts to which he or she testifies.")  The issue need not be resolved here, however, since there is ample other evidence to establish BNSF's notice of the condition of the tree.

Agan proffers BNSF's photographs of the tree showing open defects, including dead branches, damage to its base, rooting in an irrigation ditch, and leaning toward the tracks.  (Docs. 56 at ¶¶ 9, 12, 15, 20, 25-27, 29-30; 56-5 at 2; 56-6.)  Agan has further shown that in response to Purdon's call, BNSF division engineer Keith Samples reviewed a picture of the tree and decided BNSF would remove the tree.  (Doc. 56 at ¶ 7.)  Later, in June or July 2016, a site inspection was conducted involving multiple BNSF employees, and a decision was made not to remove the tree despite having the machinery and personnel available to do so. No "tree experts" were involved in the evaluation, which apparently consisted of "walking around it, looking at it, and talking about it."  (*Id.* at ¶¶ 8, 10-12.)

Therefore, Agan has presented genuine issues of material fact that preclude summary judgment.  The parties clearly dispute whether the tree was healthy or hazardous; whether it was likely to fall on the tracks; and, ultimately, whether BNSF's inspection of the tree and determination not to remove it was reasonable. (*Id.* at ¶¶ 9-12, 15, 20, 25-27, 29-30, and 34.)  These are factual issues for a jury to determine.  See, *City of Phoenix v. Whiting*, 457 P.2d 729, 735 (Ariz. 1969) (notice or knowledge of the dangerous condition of tree supported by sufficient evidence merits submission of issue to jury.)

This conclusion is further supported by the lesser standard of proof and preference for jury trials in FELA cases.  In *Mendoza v. So. Pac. Transp. Co.*, for

example, the Ninth Circuit recognized that "courts have held that only slight or minimal evidence is needed to raise a jury question of negligence under FELA." *Mendoza v. So. Pac. Transp. Co.*, 733 F.2d 631, 632 (9th Cir. 1984) (internal quotations and citations omitted).  The court agreed that "'it is only necessary that the jury's conclusion be one which is not outside the possibility of reason on the facts and circumstances shown." *Id.* at 633 (quoting *Chicago Rock Island and Pacific Railroad Co. v. Melcher*, 333 F.2d 99, 999 (8th Cir. 1964)).  The Ninth Circuit further recognized that Congress intended that a larger proportion of FELA cases be decided by jury than ordinary common law actions.  *Id.*  Thus, even "slight evidence is sufficient to raise a jury question." *Id.*  See also, *Armstrong v. Burlington Northern R. Co.*, 139 F.3d 1277, 1279 (9th Cir. 1998) (summary judgment not appropriate given the "minimal proof required to show negligence under the FELA."); *Smith v. Union Pacific Railroad Co.,* 671 Fed. Appx. 556 (9th Cir. 2016) (recognizing preference for jury determinations under the FELA and affirming that only "slight" or "minimal" evidence is needed to raise a jury question).  As in these cases, summary judgment is not appropriate here.

BNSF's proffers several cases to support its argument that expert testimony is necessary, but none compel such a finding here.  In *Estate of Clock ex rel. Clock v. Kemp*, 2011 WL 2859875 (Mich. Ct. App. July 19, 2011), for example, the court did not find that expert testimony was required to establish a standard of care.

11

Instead, the Michigan Court of Appeals affirmed summary judgment in a non-FELA case, finding that there was no issue of material fact regarding whether defendants had constructive notice of the dangerous condition.  The court determined that the plaintiff failed to raise a genuine issue of material fact because the evidence he presented regarding alleged visible decay was based on conjecture, speculation, and a misinterpretation of the facts on the issue of notice.  *Id.* at *2. That is not the case here.

Similarly, in *Martin v. Norfolk S. Ry. Co.*, 2018 WL 6840128, at *1 (M.D.N.C. Dec. 31, 2018), *aff'd*, 787 F. App'x 162 (4th Cir. 2019), the plaintiff's claims against the railroad did not turn on whether expert testimony was necessary to establish the railroad's standard of care.  In *Martin*, a railroad employee was traveling on a public highway, not a railroad right-of-way, when a tree fell on his vehicle.  The court found that the employee-plaintiff failed to create issues of material fact that his injury was foreseeable to the railroad.  *Id.* at *5.  In so holding, the Court focused on the "paucity" of evidence to support the plaintiff's claim for negligence despite the FELA's "low causation standard."  *Id.*  The court did discuss expert testimony as to another defendant on the issue of causation, finding the lack of expert testimony left the jury to speculate as to what factors may have caused the tree to fall.  *Id.* at *13.  But this did not relate to the claim

against the railroad, the railroad's obligation to maintain its right-of-way, or the issue of the railroad's standard of care.

Two cases cited by BNSF did involve the question of whether expert testimony was necessary to establish the standard of care, but in much different contexts. *State Farm Fire & Cas. Co. v. PacifiCorp*, 2015 WL 4249901 (D. Utah July 13, 2015), involved a power authority (PacifiCorp) that owned and operated power lines, power equipment, and a transformer on an insured's property in Utah. When a fire started on the property, State Farm filed suit alleging PacifiCorp failed to trim trees and allowed them to grow too close to the power lines, allegedly causing the fire that burned an insured's home. *Id.* at *1. The court found that the insurer needed an expert to testify about the standard of care applicable to a power authorities' maintenance of their lines and equipment. *Id.* at *4.

The other case involved a governmental agency's standard of care regarding highway safety, in *Dubiel v. Montana Dep't of Transp.*, 272 P.3d 66, 68 (Mont. 2012). The court held there were numerous interrelated factors that must be considered by the transportation department in deciding whether to close a public highway which are not within the knowledge of a lay person. *Id.* at 70.

Nevertheless, the standard of care for a public utility in safely maintaining aerial power lines, and the care required of a governmental agency in maintaining safety on a public highway, are far removed from the issues presented here. The

13

specialized knowledge required to maintain power lines, or a public highway, may be beyond the common experience of the trier of fact; a landowner's determination of whether a tree on their property may be hazardous and should be removed is not. Moreover, neither case was considered under the FELA's more lenient liability standards.

BNSF's last case, *Katkish v. D.C.*, is closest to the case at bar but distinguishable. In *Katkish*, a landowner contacted the District of Columbia's Tree and Landscape Division when he noticed a tree had shifted to lean more prominently over his home. *Katkish v. D.C.*, 763 A.2d 703, 704 (D.C. 2000). The trial court found that the plaintiff did not convey the emergency nature of the situation to the District's tree division. *Id.* at 705. Based on the finding that no emergency situation was presented, the circuit court agreed with the lower court that expert testimony was necessary to establish the standard of care for comparable governmental entities and the national standards they recognize. *Id.* at 706. The court said: "we hold that the trial court did not err in ruling that the standard of reasonable care and maintenance of a dead and leaning tree by a municipality, at least in the non-emergency situation presented here, are beyond the ken of the average person." *Id.*

Therefore, the only evidence on record in *Katkish* was a homeowner's report of a "dead" or "leaning" tree, which required an expert to opine on the

14

municipality's standard of care for abatement of that situation.  *Id.* at 704, 706. Here, BNSF was put on notice when Purdon called the railroad's safety hotline to notify them of the tree's condition.  But BNSF had much more than this single report.  It had photographic evidence of the tree, ample time to inspect the tree, and had decided to remove the tree.  Then, after having the resources and opportunity to remove the tree, decided not to do so.

In short, none of the cases relied upon by BNSF compel a finding that expert testimony is required to establish the applicable standard of care in the circumstances presented in this case.  The Court finds that there are genuine issues of material fact as to whether BNSF exercised reasonable care in not removing the tree from its right-of-way in these circumstances.  Therefore, the Court recommends the motion be denied as to the standard of care.

### 2.    49 C.F.R. § 213.37

In her complaint, Plaintiff alleges that BNSF's negligence included a violation of 49 C.F.R. § 213.37.  That regulation mandates that "[v]egetation on railroad property which is on or immediately adjacent to roadbed shall be controlled so that it does not … (c) [i]nterfere with railroad employees performing normal trackside duties."

BNSF argues that 49 C.F.R. § 213.37 does not apply to employees injured while transporting a locomotive because they are not conducting "trackside

duties," as the term is used in that regulation.  (Doc. 42 at 18-19.)  BNSF cites

S*chmitz v. Canadian Pac. Ry. Co.*, 454 F.3d 678, 679 (7th Cir. 2006) in support.

Agan responds that case law supports the inclusion of duties performed on

tracks as within "trackside duties," thus § 212.37 is applicable, and that BNSF's

cases in support are inapposite.  (Doc. 55 at 25-26.)  The Court agrees.

First, *Schmitz* does not remotely support BNSF's position regarding the

application of § 212.37.  The question in *Schmitz* was whether the district court

erred in refusing to instruct on the railroad's duty under the regulation on the

grounds that it was not designed to protect against the injury sustained – falling in

a hole.  The Seventh Circuit reversed and made clear that "a FELA's employer's

violation of a statutory or regulatory duty gives rise to FELA liability for a

resulting employee injury, regardless of whether the statute or regulation was

meant to protect against the particular harm sustained by the employee."  *Id.* at

683.

In short, *Schmitz* plainly does not support BNSF's position that this

regulation "is intended to remedy tripping hazards or obstructions that impact work

alongside the track, not the flow of train traffic."  (Doc. 42 at 19.)  Moreover, at

least two courts interpreting this regulation have held that "[g]iving the term

'trackside duties' its logical meaning … it extends to duties performed on, as well

as on the side of the tracks."  *Cent. of Georgia R. Co. v. Lightsey*, 400 S.E.2d 652,

16

656 (Ga. Ct. App. 1990).  See also, *Norfolk Southern Ry. Co. v. Blackmon*, 585

S.E.2d 194, 200 (Ga. App. 2003) (track inspector injured while riding hi-rail

vehicle on tracks was performing trackside duties.)

Therefore, work performed on the tracks can be covered by the regulation.

Whether the regulation was violated here is a question of fact for the jury.  The

Court recommends that summary judgment as to this claim be denied.

### 3.    Train Speed

BNSF argues that Agan's allegations relating to the failure to reduce train

speed due to the cottonwood tree's localized hazard are preempted by the Federal

Railroad Safety Act ("FRSA"), 49 U.S.C. § 20106, and its implementing

regulations, 49 C.F.R. § 213 *et seq.*  (Doc. 42 at 22.)  The FRSA requires national

uniformity of laws related to railroad safety.  49 C.F.R. § 213.9, in turn, sets forth

the national uniform regulation governing maximum allowable operating speeds

according to the class of the railroad track.

Agan responds that preemption relates to state law claims, whereas BNSF's

argument relates to the interaction between two federal statutes, which presents a

question of preclusion.  (Doc. 55 at 27-28.)  Agan argues that she is not precluded

from bringing a FELA claim relative to speed by the FRSA.  (*Id.* at 28.)  In

support, Agan relies on the U.S. Supreme Court's framework for analyzing

17

preclusion elucidated in *POM Wonderful, LLC v. Coca-Cola Co.*, 573 U.S. 102, 111 (2014), and other cases. (*Id.*)

Agan's proposition of law is correct in that preemption concerns whether state law is preempted by federal statute or federal agency action, and preclusion concerns whether one federal statute precludes a cause of action under another federal statute. *POM Wonderful*, 573 U.S. at 111 (2014). Here, Agan brings a negligence claim under FELA and does not allege state law claims. Thus, preemption is not at issue.

Terminology aside, the Court further finds Agan's FELA claim relating to track speed is not precluded by the FRSA. The FELA was enacted in 1908 and later amended in 1939 to provide a remedy to railroad employees for injuries and death resulting from accidents on interstate railroads and does away with several common-law tort defenses. *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 542-43 (1994). The FELA is to be liberally construed to further its "humanitarian purposes." *Id.*

The FRSA was enacted 62 years later in 1970 "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA also contains a preemption clause, which states: "A State may adopt or continue in force a law, regulation, or order related to railroad safety … until the Secretary of Transportation … prescribes a regulation or issues

18

an order covering the subject matter of the State requirement."  49 U.S.C.A. §

20106.

In *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658 (1993), the U.S.

Supreme Court considered the effect of this preemption provision in a case

alleging excessive train speed.  The Court determined that 49 C.F.R. § 213.9

created a uniform maximum speed limit that already took safety hazards and track

conditions into account, foreclosing common law claims relating to unsafe speeds.

*Easterwood*, 507 U.S. at 674.  Thus, any state common law claims challenging a

track's speed limit was, "at the least … incompatible with FRSA and the Secretary

[of Transportation]'s regulations" because 49 C.F.R. § 213.9 occupied the subject

matter of speed limit with respect to track conditions.  *Id.* at 675-676.

Three circuit courts later relied on *Easterwood* to find that the FRSA also

precludes claims under the FELA where a state law claim would be preempted by

the FRSA.  See *Nickels v. Grand Trunk Western R.R., Inc.* 560 F.3d 426, 430 (6th

Cir. 2009); *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443 (5th Cir. 2001); and

*Waymire v. Norfolk & W. Ry. Co.,* 218 F.3d 773, 776 (7th Cir. 2000).  *Waymire*

*and Lane* involved the same issue presented here – the preclusive effect of 49

C.F.R. § 213.9 on FELA claims alleging excessive train speed.  Several district

courts decisions also relied on *Easterwood* to find preclusion of FELA claims

relating to train speed, which are relied upon by BNSF here.  (Doc. 42 at 22-23,

19

citing *Rice v. Cincinnati, New Orleans & Pacific Railway Co.,* 955 F.Supp. 739 (E.D. Ky. 1997); *Thirkill v. J.B. Hunt Transport, Inc.*, 950 F.Supp. 1105, 1107 (N.D. Ala. 1996); and *Garza v. Norfolk S. Ry. Co.*, 2012 WL 3758632, at *4 (N.D. Ohio July 23, 2012).

In 2014, however, the U.S. Supreme Court provided guidance on the preclusive effect of one federal statute on another in *POM Wonderful LLC v. Coca-Cola Co.,* which is particularly instructive here.  In *Pom Wonderful*, the Court considered whether the Federal Food, Drug, and Cosmetic Act ("FDCA") has a preclusive effect on certain suits under the Lanham Act.  The FDCA prohibits misbranding of food and drink.  21 U.S.C. §§ 321(f), 331.  The Lanham Act provides for a cause of action for one competitor to sue another based on false and misleading product descriptions.  15 U.S.C. § 1125.

The Supreme Court ultimately determined that a claim under the Lanham Act was not precluded by the FDCA.  In its analysis, the Court first looked to the language of the statutory provisions to determine whether the text of the two statutes expressly forbids or limits a Lanham Act claim.  The Court found no such prohibition, which it deemed significant.  The Court pointed out that the two statutes had coexisted for almost 70 years.  If Congress concluded that the Lanham Act interfered with the FDCA, it had ample time to enact a provision addressing the issue.

The Court also considered that the FDCA had an express preemption provision that forbids states from imposing requirements similar to the FDCA requirements for food and beverage labeling.  Thus, the FDCA's preemption provisions applied only to state law, but not to other sources, such as federal statutes.  The Court also found this to be significant, stating "[b]y taking care to mandate express pre-emption of some state laws, Congress if anything indicated it did not intend the FDCA to preclude requirements arising from other sources." *Id.* at 114.

The Court also considered whether the two statutes could be harmonized. "When two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other." *Id*. at 115.  The Court found the two acts complimented each other, each having its own scope and purpose; "the Lanham Act protects commercial interests against unfair competition, while the FDCA protects public health and safety." *Id.*

Finally, the Court rejected the argument that allowing Lanham Act claims would upset Congress's intended national uniformity in food and beverage labeling.  The Court acknowledged that allowing Lanham Act claims would result in some variation in outcomes throughout the country but determined that any disuniformity would be markedly different from that which would result from the

21

application of the multitude of state laws that are preempted under the FDCA. The Court pointed out that "Congress not infrequently permits a certain amount of variability by authorizing a federal cause of action even in areas of law where national uniformity is important." *Id.* at 117.

All of these considerations favor a finding that the FRSA does not preclude Agan's FELA excessive speed claim in this case. First, there is nothing in the text of the two statutes which limits FELA claims covered by the FRSA. The FELA was enacted 60 years prior to the passage of the FRSA in 1970, and the two have now coexisted for approximately 50 years. If Congress had concern that the two statutes would conflict when the FRSA was passed, or whether experience since its passage demonstrated that the FELA conflicted with the application of the FRSA, Congress could have addressed the issue.

Further, just as in *Pom Wonderful*, Congress included a preemption provision in the FRSA which applies to state law but not federal law. Therefore "far from expressly precluding suits arising under other federal laws, the provision if anything suggests that [FELA suits] are not precluded." *Id.* at 114. See also, *Henderson v. National R.R. Passenger Corp.* 87 F.Supp.3d 610, 616 (S.D. N.Y 2015) ("The Court concludes that it must not rewrite the express statutory language of the FRSA by inferring that its regulations precluded covered claims under the FELA, in addition to covered state law claims.")

Additionally, the two statutes can also be considered complimentary of each other.  As in *Pom Wonderful*, the two enactments are different in purpose and scope.  As noted in *Madden v. Anton*, 156 F.Supp.3d 1011, 1021 (D. Neb. 2015), the FRSA applies to promote safety in every area of railroad operations and protects the public and railroad workers, while the FELA is applicable only to railroad workers.  They are also different in their modes of enforcement.  The FRSA is enforced through a comprehensive regulatory scheme; the FELA provides a private right of action for injured railroad works.  "Thus, allowing FELA suits 'takes advantage of synergies among multiple methods of regulation' and is consistent with 'the congressional design to enact two different statutes, each with its own mechanisms to enhance' railroad safety."  *Id.*

Finally, *Pom Wonderful* addresses BNSF's argument that "permitting FELA claims to proceed on the basis of standards different from those in the FRSA would eviscerate the uniformity and regulatory certainty that the FRSA regulations were designed to provide."  (Doc. 61 at 11.)  Congress has directly addressed the issue of uniformity by providing a preemption provision for state law claims – thus barring potential conflicts with a host of state laws and regulation – while leaving the door open for claims based on other federal statutes.  BNSF is correct that it may potentially be found liable under the FELA even when it has complied with standards applicable to the general public.  But as observed in *Henderson*, "holding

23

railroads to a standard of care with respect to their employees that is higher than the state standards applicable to the general public is precisely the purpose of the FELA." *Henderson*, 87 F.Supp.3d at 617.

In line with *Pom Wonderful*, most courts that have considered the issue since the decision have found that FELA claims are not precluded by the FRSA.  See e.g., *Henderson.*, 87 F.Supp.3d at 611 ("Guided by the Supreme Court's recent decision in *Pom Wonderful LLC . . .* the Court holds that the FRSA and its regulations do not preclude federal claims under the FELA."); *Madden,* 156 F.Supp.3d at 1017 (plaintiff's FELA claim, including claim of failing to "implement a slow order for his train," was not precluded by the FRSA); *Noice v. BNSF Railway Co.,* 383 P.3d 761, 766 (N.M. 2016) ( FRSA does not preclude FELA excessive speed claims).  The Court finds the reasoning in these cases to be persuasive.

The cases cited by BNSF that have continued to find preclusion after *Pom Wonderful* have generally been constrained by pre-existing circuit precedent.  See e.g., *Kopplin v. Wisconsin Central, Ltd,* 2017 WL 7048811 at *2 (E.D.Wis. October 17, 2017) (court "could not hold that *Pom Wonderful* abrogated or reversed *Waymire*; only the Seventh Circuit itself, or the Supreme Court, could make that decision."); *Wheeler v. CSX Transportation, Inc.*, 2017 WL 3116701, at

24

*12-13 (N.D. Ohio July 21, 2017) (because the court is not "powerfully convinced" that the Sixth Circuit would overrule *Nickels* it remains binding law).

Therefore, the Court recommends that BNSF's motion as to Agan's excessive speed claim be denied.

## B.        Motion for Summary Judgment – Future Damages

BNSF moves for partial summary judgment as to future damages.  (Doc. 49.)  Specifically, BNSF argues that summary judgment is appropriate as to Agan's claims for future lost earning capacity, pain and suffering, and household services because Agan failed to provide a calculation of those damages in her initial disclosure.  (Doc. 50 at 2.)  BNSF also contends that the claims fail because they are not supported by expert testimony.  *Id.*

### 1.        Initial Disclosure

In her initial disclosure, and in supplemental disclosures, Agan stated that she intended to seek recovery of certain damages, including loss of earning capacity, future pain and suffering, and loss of household services.  (Doc. 67-8, 67-10, 67-11.)  Thus, BNSF has been on notice from the outset of this case that Agan intended to pursue claims for those categories of damages.

Agan did not, however, provide "a computation of each category of damages claimed," as required by Fed. R. Civ. P. 26(a)(1)(A)(iii).  BNSF now requests that sanctions be imposed under Fed. R. Civ. P. 37(c)(1) for failure to provide a

25

damages computation for those categories, and that partial summary judgment be granted in its favor.

Rule 37(c)(1) provides "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence … at trial, unless the failure was substantially justified or is harmless."  "The determination of whether a failure to disclose is justified or harmless is entrusted to the broad discretion of the district court." *S.F. Bay Area Rapid Transit Dist. V. Spencer*, 2007 WL 421336 at *4 (N.D. Cal. Feb. 5, 2007)

The Court finds that Agan's failure to provide a computation for those categories of damages to be harmless.  BNSF was served with Agan's first initial disclosure on November 27, 2019 (Doc. 67-8) and was provided supplemental disclosures on August 17, 2020 (Doc. 67-10), and September 2, 2020 (Doc. 67-11). It appears BNSF did not object to the omission of damages computation for those categories of damages; BNSF did not request to meet and confer regarding the omission; BNSF apparently did not conduct any discovery regarding the omitted damages computation; and it did not seek any relief from the Court to compel disclosure of the information.  It appears it did nothing until discovery closed, when it sought sanctions terminating those damages claims.  BNSF's lack of any action to obtain a damages computation for these categories of damages

demonstrates the relative importance of this information in the preparation of its defense.  Even now, BNSF has not made any showing that it has been prejudiced by this omission.

If BNSF felt aggrieved by the omission, it could have promptly sought supplementation of the initial disclosures.  As noted in *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 243 (D. Nev. 2017), "initial disclosure requirements are meant to provide necessary information to create a balanced playing field," and the discovery rules "should not be viewed as procedural weapons through which parties seek to gain a tactical litigation advantage."  Imposing sanctions in these circumstances would "create perverse incentives" to stay silent concerning an omission in an initial disclosure, wait until discovery is complete and the omission cannot be remedied, and then seek terminating sanctions.  *Excel Fortress Limited v. Wilhelm*, 2019 WL 2503684 at *4 (D. Ariz. June 17, 2019).  Such a practice is certainly not in keeping with the purpose and spirit of the rules.

Therefore, the Court recommends that BNSF's motion based on the adequacy of Agan's initial disclosure be denied.  If she has not already done so, however, Agan shall provide BNSF with a computation of her claimed damages for loss of earning capacity, pain and suffering, and loss of household services.

/ / /

### 2.     Adequacy of the Evidence

BNSF also contends that Agan's damages claim for loss of earning capacity, future pain and suffering, and loss of household services is not property supported by expert testimony.  (Doc. 50 at 4.)  Agan counters that these damages are adequately supported by competent evidence and expert testimony is not required. (Doc. 66 at 14-16.)  Each category of damages will be discussed in turn.

### a.     Lost Earning Capacity and Earnings

A plaintiff is entitled under the FELA "to recover a verdict for future lost earning capacity if [they have] produced competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him." *Gorniak v. Nat'l R.R. Passenger Corp.*, 889 F.2d 481, 484 (3d Cir. 1989); see also, *Fleming v. Am. Exp. Isbrandtsen Lines, Inc.*, 451 F.2d 1329, 1333 (2d Cir. 1971) (accord *Wiles*); *Lawrence v. Norfolk Dredging Co.*, 319 F.2d 805, 809 (4th Cir. 1963) (comparison of earnings before and after injury not controlling when evidence supports the conclusion that the injury adversely affects future employment possibilities); *Taylor v. Consol. Rail Corp.*, 114 F.3d 1189, 1997 WL 321142, * 4 (6th Cir. 1997) (adopting *Wiles* and *Gorniak's* requirement of showing that injury decreased ability to obtain work beyond present employer or to weather adverse economic circumstances).

Here, the Court finds genuine issues of material fact exist as to Agan's future earning capacity or future lost wages.  While BNSF states "there is no evidence" Agan's impairments impact her earning capacity, it fails to cite to the record in support of its contention other than to state that she "has been cleared to return to work without any work restrictions."  (Doc. 50 at 4.)  In this way, BNSF has not met its burden at summary judgment.

Agan, on the other hand, has produced competent evidence, which construed in a light most favorable to the nonmoving party, creates genuine issues of material fact regarding a loss of Agan's earning capacity.  First, medical treatment for Agan's neck and shoulder injuries is ongoing.  Agan initially had shoulder surgery following her accident.  (Doc. 67 at ¶ 8.)  Following that surgery, she developed deep vein thrombosis, delaying treatment for her neck injury.  (*Id.* at ¶ 5.)  Agan did return to work in February 2019.  (Doc. 67-3 at ¶ 12.)  But the work aggravated her condition and her neck and shoulder symptoms progressively worsened.  (*Id.*)  She returned to see an orthopedic surgeon in August 2020 for her ongoing neck pain, and an MRI was ordered.  (*Id.* at ¶ 15.)  Following the MRI, Agan was advised to undergo epidural spine injections in an effort to conservatively treat her neck pain.  (*Id.* at ¶ 22.)  If conservative treatment failed, however, Agan may require neck surgery.  (*Id.* at ¶ 23.)  Therefore, the record shows that Agan

continued to experience symptoms four years after the accident, and that her condition may be aggravated by her work with BNSF.

In addition, according to Agan's testimony, she has been unable to perform her work for BNSF on several occasions since returning to work.  (Docs. 67 at ¶ 30; 67-12 at 6: 31:17-23.)  Because of the aggravation of her neck and shoulder conditions, Agan states she has been forced to "lay off sick" due to her accident-related injuries.  (*Id.*)

This evidence of Agan's ongoing symptoms and physical limitations hampering her ability to work creates genuine issues of material fact as to whether Agan's earning capacity has been impacted.  There is at least sufficient evidence to make inferences in Agan's favor as the non-moving party that her injury caused "a diminution in [her] ability to earn a living" or "weather adverse economic circumstances."  *Fashauer*, 57 F.3d at 1284 (quoting *Gorniak*, 889 F.2d at 484); *Taylor*, 1997 WL 321142 at * 4.  See also, *Danko v. Union Pacific Railroad Co.*, 2007 WL 1854059, at *7 (N.D. Tex. June 28, 2007) (plaintiff's testimony that he had to stay off work an average of six days each month was sufficient to create issues of material fact regarding a loss of earning capacity).

The Court also finds that BNSF's argument that Agan must establish lost earning capacity through expert testimony unpersuasive, especially since it unsuccessfully made – and conceded – the same argument only recently in *Carlson*

30

*v. BNSF Ry. Co.*, 2019 WL 2168767, at *7 (Minn. Ct. App. May 20, 2019) ("…
BNSF does not cite any legal authority … and also conceded at oral argument that
federal caselaw has held that vocational expert testimony is not required to support
damages for lost earning capacity.")  In *Carlson*, the Minnesota Court of Appeals
rejected BNSF's argument based on the Third Circuit's holding in *Fashauer*.  In
*Fashauer*, the Third Circuit rejected a railroad's argument that evidence supporting
lost earnings capacity had to come from a vocational expert, instead finding the
plaintiff failed to produce "competent evidence."  *Fashauer*, 57 F.3d at 1284
(quoting *Gorniak*, 889 F.2d at 484) ("We read *Wiles* as allowing a FELA plaintiff
to recover a verdict for future lost earning capacity if he has produced competent
evidence suggesting that his injuries have narrowed the range of economic
opportunities available to him."); see also, *Newsome v. Wisconsin Cent. Ltd.*, 131
F. Supp. 3d 782, 788 (E.D. Wis. 2015) ("I find that Newsome has presented
competent evidence suggesting that his injuries have narrowed his range of
economic opportunities."); *Danko*, 2007 WL 1854059, at *7) ("Vocational expert
evidence on this issue is not necessarily required.")  For the reasons discussed
above, the Court finds sufficient competent evidence on the record from which a
jury could determine that Agan's future earning capacity has been diminished by
her injury.

Therefore, the Court recommends BNSF's motion as to future earning capacity and wages be denied.

### b.    Future Pain and Suffering

BNSF argues that Agan's claim for future pain and suffering is speculative and lacks any medical or expert support.  (Doc. 68 at 6.)  Agan responds that her testimony regarding her injuries and subsequent pain and suffering is corroborated by her medical providers, Drs. Shenton, Elliott, and Roccisano, and is sufficient to raise genuine issues of material fact.  (Doc. 66 at 17-18.)

A plaintiff need only establish that future pain and suffering will occur with reasonable probability.  *Marchica v. Long Island R. Co.*, 31 F.3d 1197, 1207 (2d Cir. 1994) ("A FELA plaintiff is entitled to recover for all past, present and probable future harm attributable to the defendant's tortious conduct, including pain and suffering and mental anguish."); see also *Ninth Circuit Manual of Model Civil Jury Instruction* § 5.2 (2017) (damages to consider include "the mental, physical, emotional pain and suffering experienced and which with reasonable probability will be experienced in the future.")

As discussed above, Agan continues to experience pain from her injuries four years after her accident.  She also continues to receive care and treatment for her injuries and has been prescribed cervical injections to treat her pain.  Indeed, in her expert disclosures, Agan identified six medical providers who would opine on,

32

among other things, her need for ongoing medical treatment, future physical pain

and emotional distress and impairment, as well as the permanency of her injuries.

(*See* Doc. 54-4.)

Indulging all inferences in Agan's favor, this evidence is sufficient to create

an issue of fact regarding whether it is reasonably probable that Agan will

experience pain in the future.  Therefore, the Court recommends that BNSF's

motion as to future pain and suffering be denied.

### c.    Household Services

BNSF argues that Agan's failure to disclose an expert on her claim for loss

of household services warrants partial summary judgment on the claim (Doc. 50 at

6.)  In support, BNSF cites to two state lower court cases: *Gillespie v. Rajadas*,

2017 Colo. Dist. LEXIS 1338 (July 31, 2015) and *Alt v. Franceski*, 2004 Pa. Dist.

& Cnty. Dec. LEXIS 216, *36, 68 Pa. D. & C.4th 241, 267 (Sept. 29, 2004.)  (*Id.*)

Agan responds that her evidence establishes she was unable to perform

certain household tasks after her injury, thus raising genuine issues of material fact,

and that expert testimony is not always necessary.  (Doc. 66 at 21.)

The Court agrees that an expert witness is not always required to establish

damages for household services.  The authorities cited by BNSF do not support

that proposition.  In *Gillespie*, damages for loss of household services were

disallowed because the plaintiff represented that he would establish the damages

by expert testimony and then failed to do so.  The court did not find that expert testimony was, in fact, required in all cases.  In *Alt*, the court rejected the defendant's argument that expert testimony should be excluded on the issue of loss of household services, finding that such testimony is appropriate.  But the fact that such testimony is admissible in Pennsylvania courts does not establish that it is necessary in all cases.

In this case, Agan has produced competent evidence that is sufficient to create a genuine issue of material fact whether she has sustained a loss of household services as a result of her injuries.  She has provided an affidavit in response to the summary judgment motion, and attests that during the period between the incident and returning to full work duty, she was unable to perform routine household chores such as laundry, vacuuming, cleaning, grocery shopping, shoveling snow or scraping snow from her car in winter, and maintaining her property, including mending fences.  (Doc. 67-13 at ¶ 7.)  After returning from work, Agan has been able to perform some of the lighter tasks, but not heavier tasks like shoveling snow or mending fences.  (*Id.* at ¶ 9.)  Thus, the Court finds that Agan has raised genuine issues of material fact as to her claimed damages for household services.

Therefore, the Court recommends BNSF's motion as to losses for household services be denied.

## IV.    Conclusion

Based on the foregoing, **IT IS RECOMMENDED** that:

1.     BNSF's Motion for Summary Judgement as to Negligence (Doc. 41) be GRANTED as to Agan's claims relating to failure to provide proper protective equipment in the locomotive and failure to adequately instruct and train, and DENIED in all other respects; and

2.     BNSF's Motion for Partial Summary Judgement as to Damages (Doc. 49) be DENIED.

**IT IS ORDERED** that Agan provide BNSF with a calculation of her damages for loss of earning capacity, past and future pain and suffering, and for loss of household services within fourteen (14) days of this order.

**IT IS FURTHER ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.  D. Mont. Local Rule 72.3.

DATED this 27th day of August, 2021.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge

35